In the Matter of the Estate of ELLEN RODGERS, Deceased.

Surrogate's Court, New York County, April 13, 1933.

*William F. Lally*, for the executor.

*Gabriel L. Kaplan*, for the petitioner-objectant, Francis J. Rodgers.

*Max Rosner*, for the petitioner-objectants, Arthur J. Rodgers and James J. Rodgers.

*Edwin L. Stanton*, special guardian, for Frank Rodgers, infant.

DELEHANTY, S. Ellen Rodgers died January 7, 1931. Her will was admitted to probate on March 2, 1931, and letters testamentary were issued on March 21, 1931. At the time of her death, deceased was residing at 9 Van Nest place, and was there conducting a furnished room business out of which she made her livelihood. With her resided her two sons, James J. Rodgers and Arthur Rodgers. Her eldest son Frank was married and was living elsewhere in the city. These sons are her only next of kin.

By her will she gave to her eldest son Frank the sum of $5,000, and to her grandson, the son of Frank, the additional sum of $5,000. After providing $1,000 for a niece and $1,000 for funeral expenses, she gave the entire remainder of her estate to her sons James and Arthur. At the time of her death she had in savings banks approximately $3,600, and she owned in addition the unincumbered property wherein she carried on business. This latter was appraised as of the date of death at $28,000. If her estate were adjusted on the values existing at the date of her death, and if Frank and his son are treated as one, there would be established a practical equality of treatment as among her sons.

After her death her younger sons, James and Arthur, continued to live in the premises, and the furnished room business was continued therein after a fashion. Without the supervision and attention of the deceased the business ran down-at-heel and over a period of approximately eighteen months the gross income therefrom had reached practically the vanishing point. As of August, 1932, a lease of the entire premises was made to one Mrs. Corrigan, also engaged in the furnished room business, and thenceforth a monthly rental of $150 was collected from the premises.

The premises have not been sold and there is no proof before the court that an opportunity ever existed to make a sale nor is there proof of the present value of the premises. During the interval shortly after the death of their mother, the sons James and Arthur either gave up or lost their employment, but they continued thereafter to remain in the premises without paying any rent and without, so far as the testimony shows, contributing anything substantial to the care and management of the property or of the business therein. The actual day-by-day supervision of the building appears to have been committed to one Sullivan, whose personal habits and appearance seem to have been detrimental to the success of the furnished room business.

The executor named in the will, who is here accounting and against whom there is pending a petition for his removal, was and is a tea merchant having a place of business not far from the premises formerly owned by deceased. The proof before the court

establishes satisfactorily that he has accounted fully for all money that came into his hands. He has kept the funds of the estate on deposit in an account in the name of the estate; he has carefully put therein all moneys of the estate as soon as received; and he has kept a careful record of all payments therefrom. In so far as his actual handling of the funds of the estate is concerned, no criticism can be made. Direct charges and indirect intimations have been made of personal dishonesty of the executor. The court finds these to be wholly without substance. In so far as the testimony of either of the sons of the deceased or of other witnesses directly states or intimates indirectly either personal dishonesty on the part of the executor or desire on his part to benefit personally at the expense of the estate, the court adopts as true the version of the transaction given by the executor and discredits entirely any contrary testimony of the sons.

Giving to the executor the full benefit of his undoubted personal honesty, there is still left upon the record a history of gross and continued neglect by this executor of the affairs of the estate and unexcused failure to protect and preserve the property committed to his care. He seems to have been of opinion that the estate was well able to pay all general legacies and to leave a substantial balance for the residuary legatees. He seems to have been wholly unaware of the fact that he owed an affirmative duty to the general legatees to take charge of the property himself and to make such disposal of it as would recognize and protect their interests. Over a two-year term he has done absolutely nothing to liquidate the affairs of the estate. In that two-year period he visited the premises only three times. The first was at the wake of the deceased. The second was in the summer of 1932 (eighteen months after the first visit) when he went to demand from one of the sons twenty dollars which the latter had collected and misappropriated. The third and final occasion was in early September, 1932, when he made a quarrelsome demand upon Mrs. Corrigan for the payment by her of the monthly rent due under the lease entered into the preceding month. During all the rest of his executorship he depended entirely upon the word-of-mouth reports respecting the property given to him from time to time by the sons of deceased and by the employee Sullivan. Over most of this period there was a steadily declining return from the property. For a short time after the death of deceased the business she had built up continued to run by its own momentum, but in a few months the gross income fell off until in the summer of 1932 it had reached a negligible amount per month. The court does not hold that the executor was required to maintain in the premises a furnished room business. But the

fact is that he did so maintain a business and is chargeable with the results of his neglect thereof. He had the choice to apply on proper application to the court for leave to mortgage or sell the premises, or he could have let the premises to a tenant of the whole thereof, or (if he determined at his own risk to carry on a furnished room business) he could have given proper supervision thereto. He did none of these. As stated, he merely neglected the property entirely. He did not transfer the fire insurance to the estate or to himself as executor. He took no care of the furniture. He let taxes accumulate penalties despite his possession of funds ample to pay them without penalty and, in brief, acted as if the property was that of the residuary legatees with whose management he had no concern.

Upon the hearing he was called as a witness by those seeking his removal. He had all the advantages of the fact that the questions directed at him by opposing counsel were necessarily limited to the proper form of direct examination. He had the added advantage that his own attorney was free to cross-examine him and by leading questions to develop any matters that might be favorable to him in respect of his administration. Notwithstanding this, he was shown by his own testimony to have utterly failed to discharge properly the trust reposed in him. His incompetence, his lack of appreciation of the obligations imposed upon him and his unwillingness to discharge the duties of his office have been established and the application to remove him must be granted.

Coupled with this application for his removal is an application for the surcharge of his accounts by substantial amounts alleged to have been lost to the estate through his negligence. That losses have occurred is plain. There is substantial difficulty in determining a basis upon which the amount of such losses attributable to the executor can be measured. The death of deceased occurred at a time when real estate values were shrinking, when rents were declining and when general business and employment was suffering from a depression which continued throughout the entire administration of the estate and down to the present date. The loss of tenants throughout the period of administration by this executor cannot fairly be attributed entirely to his neglect. The class of tenant which occupies furnished rooms is among the first to be affected by diminution in employment and consequent loss of ability to pay for housing. The system of management of the business, while incompetent and improper, had in a measure an offsetting advantage to the estate in that the cost of such incompetent management was less than would have been the cost of a proper management under the supervision of a competent paid housekeeper.

Taking into account the fact that in August, 1932, in the midst of the depression it was possible to secure a tenant for the entire building at a gross rental of $150, it is reasonably clear that at least that much gross rental was procurable at all times during the administration of the estate had steps been taken by the executor to seek a tenant. If, therefore, the account of the executor is recast so as to charge him with liability for that amount of gross income per month, he will have been held to a degree of liability of which he cannot complain. The liability which the petitioners for his removal seek to enforce against him is predicated upon the theory that for the eighty-two weeks between the date of testatrix's death and the lease of August 1, 1932, he should be charged with an income of $68 per week, which is the amount received weekly by testatrix from her business while she lived. This basis is unsound. It does not take into account the personal service in the business rendered by deceased. Neither does it take into account business conditions adverted to above for which the executor is not accountable. The monthly figures testified to upon the hearing indicate that on the basis fixed by the rental value of the property no loss had been incurred by the estate up to August 1, 1931. The account of rental income and expense of operation should be stated for the twelve months beginning August 1, 1931, and ending July 31, 1932, and the actual net received by the estate should be ascertained. As an addition to the net operating profit so ascertained, the executor should be charged with an amount sufficient to produce a total net of $1,800, which is the equivalent of $150 per month gross rent. In making computation of the actual net received during this twelve-month period, there must be excluded (and later credited in his account to the executor) all items such as taxes paid, insurance, or other non-housekeeping items. This year's rental is charged to the executor on the theory that he could have rented the premises at $150 per month, without any housekeeping charges, though out of such sum he would have had to pay the taxes, insurance, and other non-housekeeping charges. The books of the executor will permit ready computation of this amount and counsel should agree thereon and stipulate the facts so that the amount of the tentative surcharge can be ascertained. If counsel are unable to agree, a further hearing will be set for the purpose of establishing the proper figure.

Though the accounts of the executor will tentatively be deemed adjusted by the figure thus ascertained, the actual surcharge to be made will depend upon the result reached in the future on a mortgage or sale of the property. This rent surcharge to the executor, while fixed in a maximum sum, will be solely for the

benefit of the general legatees and not for the benefit of the residuary legatees or of the mortgagee of the interests of the legatees. In respect of the residuary legatees, they have been participants in and beneficiaries of the nonfeasance and misfeasance of the executor. In so far as any loss has been sustained to their interests in the estate, they are held to be consenting parties and not entitled to relief against the executor. The mortgagee of their interests stands in no better position than they so far as loss of rents is concerned.

In addition to this rental surcharge (limited in its application as just stated) the executor will also be charged with the penalties which have accrued upon unpaid taxes. This surcharge likewise will be made for the benefit only of the general legatees. The residuary legatees are directly responsible for these penalties because they used for themselves the money which should have been devoted to the payment of taxes.

The item of commissions paid to the Spencer Agency for rental collection is unjustified, and the account of the executor will be surcharged with the twenty-seven dollars so paid. This will be an absolute surcharge without limit as to application.

No surcharge will be made for interest on legacies. The legacies could not have been paid except by a sale of the property, and if the property had been sold there would have been no income. It is not appropriate to surcharge the executor both with interest on legacies and with rental income during the period within which such interest accrued.

The advances to the sons of deceased require detailed consideration because of four mortgages executed by some or all of them. To Frank, the eldest son, a single payment of $300 was made on December 7, 1931. Four mortgages are in evidence as having been executed by Frank Rodgers, securing the sums of $2,500, $1,500, $1,800 (now reduced to $900) and $700, respectively. Notice of these mortgages was given to the executor prior to the aforesaid payment of $300. The mortgages by their terms constitute also assignments of the interest of the mortgagors in the estate. It follows that if necessary for the protection of the interests of the mortgagee the executor must be held accountable for so much of this payment of $300 as may be required to pay the amount due from Frank Rodgers to the mortgagee. In the case of James J. Rodgers (who executed the same four mortgages) the total payments aggregate $1,157, of which amount $320 was paid to him before he executed the mortgage instruments and $837 after the executor had notice of the mortgages. In the case of Arthur Rodgers (who executed only the two last listed mortgages) the total advanced to him was $765, of which amount $500 was paid

before notice of the mortgages was given to the executor and $265 thereafter. It is not equitable to impose upon the executor the unqualified obligation to pay these respective sums of $300, $827 and $265 to the mortgagee. The mortgagee must first look for payment to the remaining interests of the respective mortgagors in the property of the estate. Until, therefore, there has been a liquidation of the estate, the decree will provide only for the fixation of the amounts so advanced to the respective legatees by the executor after notice of the mortgagee's rights and will provide that up to the maximum of such sums the executor will be held liable to make good any deficiency in the total payable to the mortgagee by the respective mortgagors after crediting the amount actually paid to the mortgagee from the shares mortgaged by the respective mortgagors. If upon liquidation of the estate the remaining balance of the shares due to the legatees suffices to pay the mortgages, there will rest upon the executor no further liability by reason of the payments adverted to. In no event is any obligation to be enforced against the executor except in the respective sums stated and only if required in the case of the respective mortgagor to whom such advance was made.

The foregoing disposition of the questions raised upon the application for the removal of the executor and for a surcharge of his accounts requires that the final determination of the executor's liability shall await the procurement of a mortgage on or a sale of the real estate so as to ascertain whether or not the general legatees can be paid. If payment of the general legacies can be made either by mortgage or sale, it would seem that the mortgages will be substantially paid without resort to a charge against the executor, since the balance payable to Frank Rodgers is $4,700 and interest and such balance is part of the security of mortgages aggregating $5,600. If, after the general legacies are paid, there remains any surplus distributable to the residuary legatees, the amounts thereof, to the extent of the remaining balance on the mortgages, will be first payable to the mortgagee, and, if sufficient to discharge the remaining respective obligations of the respective mortgagors, will relieve the executor from any liability by reason of such advances to the legatees. There is no requirement in the circumstances here to marshal the proceeds payable to the respective sons of the deceased so as to enforce at the expense of the executor any contributions legally required to be made as among themselves by the sons. They have contributed so directly to the condition now found to exist, as to make it inequitable to permit any sum to be exacted from the executor by reason of these advances if the mortgages can otherwise be satisfied. As before stated, the two residuary legatees

are the chief and active beneficiaries of these advances made in disregard of the mortgagee's rights and such advances were made at least with the knowledge and acquiescence of the son Frank, and hence the latter cannot in his character as mortgagor exact repayment by the executor of sums advanced to his brothers so as to exonerate his share even though the result may be that his share of the estate will be burdened more than would be equitable as between him and his brothers.

All of the foregoing will make it necessary that the administrator c. t. a. to be appointed be one who will protect the substantial interest of the executor that the assets of the estate be realized upon to a maximum degree. Upon the showing made at the hearing none of the sons is competent to administer the estate, nor will it be fair to the executor that the ascertainment of his eventual liability should be in the hands of men who have shown their personal hostility to him. If the parties can agree upon a person to be named as administrator who is competent for the office and indifferent as between the parties, his appointment will be made upon the giving of the proper bond. Upon appropriate application by such administrator c. t. a. the court will consider whether the real property of the estate should be mortgaged or sold. The pending application by the executor for leave to sell or mortgage is denied.

Another pending application is that of the son Frank for the payment to him of $750 on account of his general legacy. In view of the outstanding mortgages, no payment could be made to him in any event. His application is denied.

A further application is made for a construction of the will and a determination of the meaning of the fourth paragraph, which says:

" *Fourth*. I give and bequeath unto my sister, Rose Sheehy, the sum of One Thousand ($1,000) Dollars to be held in trust, however, for my niece, Mary Sheehy, until she shall have attained the age of twenty-one years."

This clause vested in Mary Sheehy an immediate interest in the sum of $1,000 and postponed only the enjoyment thereof until Mary Sheehy attained twenty-one years. If she dies before attaining that age the fund is payable to her estate. (*Matter of Lapham*, 37 Hun, 15; *Whitney* v. *Whitney*, 63 id. 78.)

It is necessary, also, to consider whether the general legacies are chargeable against the real estate. The proof shows that at the time of her death (two days after making her will) testatrix had in bank approximately $3,600 and that she had no other assets except the unincumbered parcel of real property (with furniture therein of nominal value) wherein she carried on her furnished room business. No source of funds for the payment of the general

legacies existed on the date of the will except this bank account and this real property. The effective general legacies aggregate $11,000. A further $5,000 legacy was granted but is ineffective because the intended recipient had died before testatrix made her will. There is no basis for assuming that testatrix expected to procure before her death sufficient funds to enable payment of the general legacies out of her personal estate. She made the will in the expectation of early death and it must be presumed that she intended to charge the general legacies against her real estate. The court rules that they are so chargeable. All interested parties have on the record acceded to this ruling. It is supported by authority (*Ely* v. *Megie*, 219 N. Y. 112; *Carley* v. *Harper*, Id. 295.)

Proceed accordingly.